## AFFIDAVIT OF WILLIAM C. WISE

Your Affiant, William C. Wise, being duly sworn, deposes and states as follows:

1. I, William C. Wise, am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been so employed for the past 16 years. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 16 years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers including four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by the DEA.  I am currently assigned to the Chattanooga Resident Office.   My current assignment involves investigations of high-level drug trafficking organizations operating in eastern Tennessee, north Georgia, and elsewhere.  Prior to my employment with the Drug Enforcement Administration, I was employed as an Arlington County Police Officer for approximately 5 years and 6 months in Arlington, Virginia.  As a result of my training and experience, I am familiar with how various controlled substances are used and the typical distribution and trafficking patterns generally utilized by drug dealers and traffickers.

2. This affidavit is submitted in support of an application for a search and seizure warrant for a residence utilized by Marlon EBERHARDT for the purpose of drug trafficking.  The residence

1

is located at 3812 Fagan Street, Chattanooga, Tennessee 37410, and is further described in Attachment A of this affidavit.

3. The information contained in this affidavit is based on my own personal observations and information related directly to your Affiant by other law enforcement officers. This affidavit does not include each and every fact known to your Affiant but rather contains sufficient facts to establish probable cause to support the search warrant application and order.

4. Based upon your Affiant's training, experience, and participation in investigations involving large amounts of controlled substances, your Affiant knows:

   a. That it is common practice for drug traffickers to store their drug inventory and drug-related paraphernalia in their residences.

   b. That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

   c. That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

   d. That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

   e. That large-scale narcotics traffickers may maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

   f. That narcotics traffickers maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That narcotics traffickers

2

commonly "front" (provide narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;

g. That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

h. That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

i. That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

3

j. That large-scale traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, records and/or store the information described above;

k. That when drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys, and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

m. That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

n. That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled,

4

carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

o. That the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

p. That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q. That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

5

r. That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

s. That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product and that these traffickers usually maintain these photographs in their possession;

t. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

u. That drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency;

v. That drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones. Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card, which will reveal the number of the cell phone and other information, leading to the identity of the user.

6

## FACTS ESTABLISHING PROBABLE CAUSE

5. Since approximately April 2015, the DEA, Hamilton County Sheriff's Office and other federal, state, and local law enforcement agencies have been investigating Marlon EBERHARDT for drug trafficking.

6. Your Affiant submits there is probable cause to believe Marlon EBERHARDT has been a significant distributor of heroin and cocaine in north Georgia and east Tennessee since April 2015 until July 26, 2016, when he was arrested in Rockdale County, Georgia.

7. During the course of this investigation, law enforcement confirmed, through physical surveillance and interviews with confidential sources, that EBERHARDT utilizes 3812 Fagan Street, Chattanooga, Tennessee to conduct drug trafficking. A check of public/law enforcement databases for the address of 3812 Fagan Street, Chattanooga, Tennessee, revealed that the power is registered to a Travis L. Eberhardt. Steven Ray Eberhardt lists 3812 Fagan Street, Chattanooga, Tennessee, on his Tennessee driver's license as his residence.

8. Based upon my experience and training, as well as the knowledge and experience of other agents and law enforcement officers in my office, I am aware that it is generally a common practice for drug traffickers to maintain evidence of their drug trafficking in stash houses in order to efficiently conduct their drug trafficking business.

9. Based on my training and experience, evidence of drug sales, such as books, records, letters of credit, and electronic media, are likely to be found in such stash houses. Drug proceeds and other indicia of drug trafficking such as coded telephone numbers, photographs and firearms are often secreted in safe places such as residences and/or stash houses.

7

**Information Received from Confidential Source 1**

10. From August 2015 until approximately August 2016, law enforcement officers have worked closely with a Confidential Source, hereinafter referred to a CS-1, and have independently corroborated a substantial amount of information provided by CS-1. A substantial portion of the information provided by CS-1 has been corroborated by independent investigation, including controlled purchases of narcotics, physical surveillance of targets identified by CS-1, the review of federal, state, and local law enforcement documents, interviews of other members of the above-stated drug trafficking organization, and telephone record analyses. Information provided by CS-1 has been used in submissions for wiretaps submitted as part of this investigation. For these reasons, I consider CS-1 to be reliable.

11. CS-1 has been interviewed by law enforcement officers on numerous occasions. In those interviews, CS-1 stated that in the spring of 2015, CS-1 was introduced to EBERHARDT through Jovani and Heather ROBINSON. CS-1 stated that EBERHARDT identified himself as a "Prince" in the Vice Lords street gang, and that Heather ROBINSON identified herself as a Ghost Insane Vice Lords gang member.

12. CS-1 related to law enforcement that EBERHARDT has heroin sources of supply in Chicago, Illinois, Nashville, Tennessee, and Atlanta, Georgia. CS-1 stated that Heather ROBINSON and Jovani ROBINSON are distributors for EBERHARDT and frequently accompany EBERHARDT on trips to obtain heroin from EBERHARDT's sources. CS-1 stated that EBERHARDT frequently pays females to accompany him on these trips. CS-1 identified Shayna GRISSOM, Kaitlyn CORBETT, Shelby FRYAR, and Farrah WESTMORELAND as persons EBERHARDT has paid to accompany him when he obtained heroin from his sources of

8

supply. CS-1 related that EBERHARDT would use the females to conceal the heroin on their person in case they were stopped by law enforcement. CS-1 stated that EBERHARDT typically pays the females $100.00 to $200.00 or with heroin. In approximately March/April 2015, CS-1 personally accompanied EBERHARDT, Jovani ROBINSON, and Heather ROBINSON on one of the trips to Chicago, Illinois, during which CS-1 observed EBERHARDT obtain approximately one kilogram of heroin from a later identified source of supply for approximately $30,000.00.

13. CS-1 identified EBERHARDT's residence as 6612 Flagstone Drive, Ooltewah Tennessee. CS-1 has been to EBERHARDT's residence on multiple occasions and has observed large sums of currency in the residence as recently as June 2015.

14. CS-1 stated that Jovani and Heather ROBINSON distribute heroin for EBERHARDT and store heroin obtained from EBERHARDT at their residences. CS-1 personally observed EBERHARDT deliver heroin to Heather ROBINSON, Jovani ROBINSON, and Curtis BROOKS Jr. as recent as April 2015.

15. CS-1 related that between April and May 2016, CS-1 travelled to Covington, Georgia with Brandon MOORE on approximately three occasions to obtain heroin and cocaine. CS-1 stated that the first trip with MOORE occurred on or about April 19, 2016 and that Heather ROBINSON requested CS-1 travel with MOORE on that occasion. In June 2016, law enforcement officers and CS-1 identified the above-referenced residence as 210 Stonecreek Parkway, Covington, Georgia. While at the residence, law enforcement officers and CS-1 observed a black male in the driveway of the residence. At that time, CS-1 identified the black male as MOORE's source of supply. Law enforcement officer subsequently obtained a

9

photograph of Percy RICHARD and positively identified the above-referenced black male as RICHARD.

16. CS-1 related that on each of these trips, MOORE brought a large sum of currency with him. After arriving to the RICHARD's residence, CS-1 would wait in the vehicle while MOORE entered the residence with the currency. MOORE would later return to their vehicle with narcotics and MOORE and CS-1 would then drive back to Tennessee. CS-1 related that MOORE would typically obtain three packages each containing heroin or cocaine.

17. CS-1 also related that MOORE told CS-1 that Marlon EBERHARDT typically sent $5,000.00 with MOORE to obtain heroin from RICHARD and that some of the heroin obtained from RICHARD was intended for EBERHARDT. MOORE has also told CS-1 that MOORE and EBERHARDT had travelled together to RICHARD's residence to obtain narcotics.

**Information Received from Confidential Source 3**

18. Between April 2016 and approximately May 2016, CS-3 was interviewed in-person and over the telephone by detectives of the Hamilton County Sheriff's Office and by DEA on numerous occasions

19. A substantial portion of CS-3's information has been corroborated by independent investigation, including controlled purchases of narcotics, consensually recorded telephone calls, physical surveillance, and the review of DEA documents as well as other federal, state, and local documents, interviews of other members of the above-stated drug trafficking organization, and telephone record analyses. Information provided by CS-3 has been used in submissions for pen registers and wiretaps submitted as part of this investigation. The

10

information provided by CS-3 has resulted in the seizure of heroin. For these reasons, I consider CS-3 to be reliable.

20. CS-3 has provided the following information regarding the EBERHARDT ORGANIZATION. CS-3 identified EBERHARDT as CS-3's heroin source of supply. CS-3 stated that in August 2015, CS-3 was purchasing four grams of heroin for $1,000.00 from Curtis BROOKS Jr. every other day. CS-3 stated that this lasted several months until CS-3 was introduced to Jovani and Heather ROBINSON. CS-3 stated that CS-3 then began being supplied heroin by Jovani and Heather ROBINSON. CS-3 stated that CS-3 would purchase ten grams of heroin from Jovani and Heather ROBINSON every four days for $2,000.00. CS-3 stated that CS-3 continued purchasing heroin from Jovani and Heather ROBINSON for several months until Heather ROBINSON "shorted" him. Your Affiant is aware that "shorted" is a reference to the weight of the heroin being less than what CS-3 paid for.

21. CS-3 stated that Jovani and Heather ROBINSON's source of supply was EBERHARDT. CS-3 stated that CS-3 contacted EBERHARDT via Facebook messenger and arranged to meet EBERHARDT in January 2016. CS-3 then began purchasing 10 grams of heroin directly from EBERHARDT every two days for $2,000.00. CS-3 stated that when CS-3 ordered the 10 grams, CS-3 asked for a "ten piece chicken McNugget." CS-3 stated that EBERHARDT later began providing heroin to CS-3 on consignment and lowered the price to $1,800.00 for 10 grams of heroin. CS-3 advised that CS-3 owed EBERHARDT approximately $1,800.00 for heroin previously provided to CS-3 on consignment. CS-3 advised that the largest quantity of heroin CS-3 received from EBERHARDT was 50 grams. CS-3 stated that CS-3 has seen

11

EBERHARDT with up to 100 grams of heroin. CS-3 also stated that EBERHARDT distributed cocaine.

22. CS-3 also stated that EBERHARDT's unidentified girlfriend would meet CS-3 to collect money from CS-3.

**Controlled Purchase of Heroin from Marlon Eberhardt on April 19, 2016**

23. On April 19, 2016, detectives from the Hamilton County Sheriff's Office and Task Force Officers from DEA met with CS-3 at a pre-arranged location and formulated plans to make a controlled purchase of ten grams of heroin from EBERHARDT. At approximately 5:47 p.m., CS-3 made a consensually recorded telephone call to EBERHARDT at telephone number 931-304-5266. During the call, CS-3 asked if he could "swing through and get a ten piece McNugget from McDonalds." EBERHARDT stated, "a ten piece McNugget from McDonalds." CS-3 replied, "Yeah." EBERHARDT then stated, "Yeah you probably can." CS-3 related that he had to get the money and would be ready in approximately thirty minutes. CS-3 stated that CS-3 would call EBERHARDT when CS-3 was leaving.

24. CS-3 and the CS-3's vehicle were then searched for contraband with negative results. CS-3 was supplied with $1,800.00 in pre-recorded funds for the purchase of the heroin and recording/monitoring equipment. CS-3 then departed the pre-arranged location and drove to Walgreens located at 3605 Brainerd Road, Chattanooga, Tennessee. CS-3 then made a consensually recorded telephone call to EBERHARDT at telephone number 931-304-5266. During the call, CS-3 stated that CS-3 was passing Walgreens on Brainerd Road. EBERHARDT then told CS-3, "come down to the same place that I met you last time." CS-3 replied, "that

12

street" and related that CS-3 would call EBERHARDT back. At approximately 6:00 p.m., CS-3 departed Walgreens and advised that CS-3 was going to the Moore Road area of Chattanooga, Tennessee to meet EBERHARDT. At approximately 6:04 p.m., CS-3 was observed parking in front of 5015 Cameron Lane, Chattanooga, Tennessee. During this time, CS-3 made two consensually recorded telephone calls to EBERHARDT at telephone number 931-304-5266. During these calls, CS-3 related to EBERHARDT that CS-3 was at the meet location. At approximately 6:10 p.m., surveillance observed another vehicle pull up to CS-3's vehicle. Shortly thereafter, CS-3 departed the area and met with controlling investigators at a pre-arranged location. The meeting between CS-3 and EBERHARDT was recorded via equipment provided to CS-3. Surveillance was maintained on EBERHARDT for a short period of time after the narcotics transaction with no significant activity observed.

25. At that time, approximately ten grams of heroin was recovered from CS-3. CS-3 and CS-3's vehicle were again searched for contraband with negative results. CS-3 was debriefed and advised that after arriving at Walgreens, EBERHARDT directed CS-3 to go to the same location they had met previously. CS-3 stated that CS-3 then drove to the location and met with EBERHARDT, who was driving a purple colored Chevrolet Impala bearing Tennessee license plate R0104P. CS-3 related that CS-3 gave EBERHARDT the pre-recorded monies and EBERHARDT handed CS-3 heroin.

26. The heroin recovered from CS-3 was subsequently sent to the DEA laboratory for testing and safekeeping. The lab results are pending.

13

**Controlled Purchase of Heroin from Marlon Eberhardt and Heather Robinson on April 22, 2016**

27. On April 22, 2016, detectives from the Hamilton County Sheriff's Office and Task Force Officers from DEA met with CS-3 at a pre-arranged location and formulated plans to make a controlled purchase of ten grams of heroin from EBERHARDT. At approximately 3:09 p.m., CS-3 made a consensually recorded telephone call to EBERHARDT at telephone number 931-304-5266. During the call, CS-3 discussed a meet location and EBERHARDT stated, "Come on to Rossville Boulevard." CS-3 asked where and EBERHARDT replied, "The McDonalds." CS-3 then asked if it was the same McDonalds that they had met at previously and EBERHARDT replied, "Yeah." CS-3 and the CS-3's vehicle were then searched for contraband with negative results. CS-3 was supplied with $1,800.00 in pre-recorded funds for the purchase of the heroin and recording/monitoring equipment. CS-3 then departed the pre-arranged location and drove to the McDonalds restaurant located at 4501 Rossville Boulevard, Chattanooga, Tennessee, as observed by surveillance. At approximately 3:51 p.m., CS-3 arrived to the McDonalds parking lot. At approximately 3:55 p.m., surveillance observed Heather ROBINSON walk to and enter CS-3's vehicle. Shortly thereafter, EBERHARDT was observed walking to and entering CS-3's vehicle. At approximately 3:56 p.m., EBERHARDT and Heather ROBINSON were observed by surveillance exiting CS-3's vehicle and walking to a gas station where they entered a purple colored Chevrolet Impala bearing Tennessee license plate R0104P. The Chevrolet Impala then departed the area. Surveillance was maintained on EBERHARDT and Heather ROBINSON. CS-3 then departed and met with controlling investigators at a pre-arranged location.

14

28. At that time, approximately ten grams of heroin was recovered from CS-3. CS-3 and CS-3's vehicle were again searched for contraband with negative results. CS-3 was debriefed and advised that after arriving at McDonalds, Heather ROBINSON and EBERHARDT entered CS-3's vehicle. CS-3 stated that Heather ROBINSON gave CS-3 the heroin and CS-3 gave Heather ROBINSON the pre-recorded money.

29. The heroin recovered from CS-3 was subsequently sent to the DEA laboratory for testing and safekeeping. The lab results are pending.

**Controlled Money Payment to Marlon EBERHARDT on April 26, 2016**

30. On April 26, 2016, detectives from the Hamilton County Sheriff's Office and Task Force Officers from DEA met with CS-3 at a pre-arranged location and formulated plans to make a controlled money payment to EBERHARDT for heroin that CS-3 previously received on consignment from EBERHARDT. At approximately 11:44 a.m., CS-3 made several attempted telephone calls to EBERHARDT at telephone number 423-486-3896. CS-3 then made a consensually recorded telephone call to EBERHARDT at telephone number 423-933-8944. CS-3 advised that EBERHARDT had called CS-3 from telephone number 423-933-8944 the previous night. During the call, an unknown female answered the telephone and CS-3 discontinued the call. At approximately 11:47 a.m., CS-3 sent a text message to telephone number 423-933-8944 stating "call me." At 11:48 a.m., CS-3 received an incoming telephone call from an unknown female who stated that he told me to meet with you. This phone call was recorded. Your Affiant believes that when the unknown female stated that he told me to meet with you, she was telling CS-3 that EBERHARDT directed her to meet

15

with CS-3. At approximately 11:54 a.m., CS-3 received an incoming telephone call from 423-933-8944 and spoke with EBERHARDT. During the call, EBERHARDT stated, "yeah give it her." EBERHARDT then directed CS-3 to meet the unknown female at the Walmart located at 490 Greenway View Drive, Chattanooga, Tennessee. This phone call was recorded.

31. CS-3 and the CS-3's vehicle were then searched for contraband with negative results. CS-3 was supplied with $1,000.00 in pre-recorded funds to make a money payment to EBERHARDT. CS-3 was equipped with recording/monitoring equipment. CS-3 then departed the pre-arranged location and drove to the Walmart. At approximately 12:32 p.m., CS-3 arrived at and parked in the Walmart parking lot, as observed by surveillance. Surveillance then observed a blue colored Ford Fusion bearing Tennessee license plate R8269N park next to CS-3's vehicle. The vehicle was driven by an unknown black female, believed by law enforcement to be Demetria WHEELER. WHEELER is the registered owner of the Ford Fusion vehicle. Surveillance then observed an unknown black male exit the passenger door of the blue Ford Fusion and enter CS-3's vehicle. The unknown male then exited CS-3's vehicle and departed the area in the Ford Fusion. CS-3 then departed the area and met with controlling investigators at a pre-arranged location. At that time, CS-3 and CS-3's vehicle were again searched for contraband with negative results. CS-3 was debriefed and advised that after arriving at Walmart, an unknown male entered CS-3's vehicle and CS-3 gave the unknown male the $1,000.00 in pre-recorded monies.

32. Surveillance was maintained on the Ford Fusion and later observed the vehicle drive to a Shell gas station located at 6526 Bonny Oaks Drive, Chattanooga, Tennessee. The unknown female was observed meeting with EBERHARDT outside of EBERHARDT's vehicle at the gas

16

station. The unknown female was then observed to briefly enter EBERHARDT's vehicle. At approximately 1:25 p.m., EBERHARDT departed the gas station and was observed driving to 4908 Marylin Lane, Chattanooga, Tennessee. At that time, surveillance was terminated.

## Controlled Money Payment to Marlon Eberhardt on May 12, 2016

33. On May 12, 2016, detectives of the Hamilton County Sheriff's Office and agents and Task Force Officers from the DEA Chattanooga Resident Office met with CS-3 and formulated plans to make a controlled purchase of heroin from EBERHARDT. At approximately 1:37 p.m., CS-3 sent a text message to EBERHARDT at telephone number 423-486-3896 stating "Hey it's me can u call me." CS-3 received two responses that stated, "Hey it's me can you call me" and "Wtf." At approximately 1:42 p.m., CS-3 made a consensually recorded telephone call to EBERHARDT at telephone number 423-486-3896. During the call, EBERHARDT asked who was calling. After CS-3 provided CS-3's name, the telephone call was disconnected.

34. At approximately 1:45 p.m., CS-3 sent a text message to EBERHARDT stating, "I got some more of what I owe call me." At approximately 1:52 p.m., CS-3 attempted to call EBERHARDT at telephone number 423-486-3896. The call was not answered and no message was left by CS-3. CS-3 then sent a message to EBERHARDT's Facebook account "Profesa EBERHARDT" via Facebook messenger stating, "Call me please."

35. At approximately 2:58 p.m., CS-3 received an incoming recorded telephone call from telephone number 423-316-8065. During the call, CS-3 spoke with EBERHARDT and EBERHARDT asked CS-3 if CS-3 had $800.00. CS-3 related that CS-3 had $400 for what CS-3

17

owed and was trying to do something. EBERHARDT then related that he wanted what CS-3 owed. CS-3 stated that CS-3 was attempting to get back on his/her feet, was trying to pay a little at a time, and was trying to make some money. CS-3 then asked about paying CS-3's debt and getting half of a ten piece McNugget, referring to five grams of heroin. EBERHARDT told CS-3 that one of his guys would call CS-3 and for CS-3 to meet with that person. Shortly thereafter, CS-3 received three telephone calls from telephone number 423-693-9435. CS-3 did not answer those calls.

36. At approximately 3:14 p.m., EBERHARDT called CS-3 from telephone number 423-316-8065. During the call, EBERHARDT related that his guy had called CS-3 several times. CS-3 stated that CS-3 had missed calls and was going to call the telephone number back. This phone call was consensually recorded.

37. At approximately 3:20 p.m., CS-3 received an incoming recorded telephone call from 423-693-9435 and spoke to a subject later identified as Damico LAWRENCE. During the call, LAWRENCE stated that he was Marlon's little brother and that Marlon wanted him to meet with CS-3. CS-3 stated that CS-3 wanted to make sure he/she could get something because CS-3 had people that needed some, referring to heroin. CS-3 and LAWRENCE then agreed to meet at the Family Dollar store on Brainerd Road, Chattanooga, Tennessee. CS-3 then stated that CS-3 had $800.00 owed to EBERHARDT and was trying to spend some also. LAWRENCE responded, "We'll talk."

38. At approximately 4:40 p.m., CS-3 received an incoming recorded telephone call from LAWRENCE at telephone number 423-693-9435. During the call, CS-3 related that CS-3

18

would call LAWRENCE when CS-3 got off the exit. This call was consensually recorded by the Confidential Source.

39. At approximately 4:50 p.m., detectives of the Hamilton County Sheriff's Office and agents and Task Force Officers from the DEA Chattanooga Resident Office met with CS-3 at a pre-arranged location. At that time, the CS-3 and CS-3's vehicle were searched for contraband with negative results. At approximately 5:01 p.m., CS-3 made an outgoing consensually recorded telephone call to LAWRENCE on telephone number 423-693-9435. During the call, CS-3 related that CS-3 would be there in ten minutes. LAWRENCE related that he would arrive in ten to fifteen minutes. CS-3 was then provided with $800.00 in pre-recorded monies and recording/monitoring equipment.

40. At approximately 5:08 p.m., CS-3 departed the pre-arranged location en-route to the Family Dollar located at 5000 Brainerd Road, Chattanooga, Tennessee. At approximately 5:14 p.m., CS-3 was overheard to receive an incoming call during which CS-3 stated that he/she was turning on Brainerd Road.

41. At approximately 5:15 p.m., CS-3 arrived to the Family Dollar, as witnessed by surveillance. At that time, surveillance officers observed LAWRENCE walk to and enter CS-3's vehicle. LAWRENCE was previously observed to have exited a black colored GMC Yukon bearing Tennessee license plate Y1714F parked at the Family Dollar store. LAWRENCE then exited CS-3's vehicle and walked into the Family Dollar store. At that same time, CS-3 departed the area. Surveillance was maintained on LAWRENCE and CS-3.

42. At approximately 5:22 p.m., LAWRENCE exited the store and departed the area in the GMC Yukon. Shortly thereafter, detectives of the Hamilton County Sheriff's Office and

19

Agents/Task Force Officers from DEA met with CS-3 at a pre-arranged location. At that time, CS-3 positively identified the person CS-3 met with as LAWRENCE through a photograph of LAWRENCE on his Facebook account "DMG Meko." CS-3 stated that upon meeting, LAWRENCE, CS-3 gave LAWRENCE $800.00 and asked LAWRENCE about purchasing heroin. CS-3 stated that LAWRENCE related that LAWRENCE would sell CS-3 heroin and that they agreed to meet again in approximately twenty minutes. The meeting between the CS-3 and LAWRENCE was recorded.

43. CS-3 then made several attempted telephone calls to LAWRENCE but the calls were not answered. CS-3 also sent LAWRENCE text messages but did not receive any reply messages.

44. At approximately 6:10 p.m., CS-3 made a consensually recorded telephone call to EBERHARDT at telephone number 423-316-8065. During the call, CS-3 stated, "Just letting you know I gave that to him." CS-3 then stated, "He said he was going to hit me back up in thirty minutes or so." CS-3 next asked EBERHARDT to call LAWRENCE and to have LAWRENCE call CS-3. EBERHARDT responded, "Alright." Surveillance later observed LAWRENCE depart the Raulston Street residence in the GMC Yukon. At approximately 6:30 p.m., surveillance was terminated.

**Authorized Wiretaps**

45. On June 14th, 2016, the Honorable Judge Travis R. McDonough, United Stated District Court Judge, Eastern District of Tennessee, signed an order granting authorization for the initial interception of electronic and wire communications of telephone number 423-400-5184, hereinafter Target Telephone #2. Target Telephone #2 is a cellular telephone utilized by

20

Heather ROBINSON and Jovani ROBINSON. Interceptions of Target Telephone #2 commenced on June 14, 2016. Monitoring of Target Telephone #2 has terminated.

46. On July 13, 2016, the Honorable U.S. District Court Judge, Travis R. McDonough, Eastern District of Tennessee signed an order granting authorization for the continued interception of electronic and wire communications of telephone number 423-771-5311, hereinafter Target Telephone #3, used by Heather and Jovani ROBINSON. The continued interception of Target Telephone #3 pursuant to the order commenced on July 14, 2016. Monitoring of Target Telephone #3 terminated on August 2, 2016.

47. On July 13, 2016, the Honorable U.S. District Court Judge, Travis R. McDonough, Eastern District of Tennessee signed an order granting authorization for the interception of electronic and wire communications of telephone number 423-680-9551, hereinafter Target Telephone #5, used by Marlon EBERHARDT. Interception of Target Telephone #5 pursuant to the order commenced on July 14, 2016. Monitoring of Target Telephone #5 terminated on July 26, 2016.

**Intercepted Communication from Court Authorized Wiretap of Target Telephone #2 and Surveillance of Marlon Eberhardt on June 22, 2016**

48. On June 22, 2016, at approximately 8:48 a.m., Target Telephone #2 made an outgoing telephone call to 423-680-3896, utilized by Marlon EBERHARDT. During the call, EBERHARDT stated, "I ain't on no P shit, they trying to keep Chicago from down here." EBERHARDT later related that he needed nine hundred dollars and told Jovani ROBINSON, "give me the whole, give it to you for a dollar a piece." Jovani ROBINSON replied, "I know that's what I wanted you to do. When you need it today." EBERHARDT responded, "Yeah,

21

like as soon as you get up." EBERHARDT later stated, "Well wire uhm at the Wal-Mart."
EBERHARDT later stated, "Do it before BiBi gets down here." Jovani ROBINSON replied,
"Okay." EBERHARDT later stated, "Yeah 500 and 5 and 5 yeah. I just give you the whole ten
what I get back."

49. Based on my training and experience, and knowledge acquired during the course of this
investigation, Your Affiant believes that during the above referenced telephone call when
EBERHARDT discusses the "P" and "Chicago," he is referring to his heroin source of supply.
EBERHARDT related that he needed money to obtain additional heroin and would give
Jovani ROBINSON the heroin for $100.00 per gram. EBERHARDT then directed Jovani
ROBINSON to wire transfer the money before "BiBi," known to be Brandon MOORE, arrived
and stated that he would give Jovani ROBINSON ten grams of heroin after he returned from
meeting with his source of supply in Atlanta, Georgia.

50. At approximately 10:16 a.m., Target Telephone #2 sent multiple outgoing text messages to
telephone number 423-413-8146, used by Farrah WESTMORELAND, stating, "1 - Go pick up
Brandon's girlfriend (423) 624-9739 Lyndsey SHE HAS $200 and would rather ride along with
u 2 – Go pick up Mike (423) 755-1692 Take Mike to meet Marlon. Take the bench with you.
He wants $1000 for 10g." Based on my training and experience, and knowledge acquired
during the course of this investigation, in the above message Heather ROBINSON directed
WESTMORELAND to collect $200.00 from their customers, to take Michael HICKS with her
to meet EBERHARDT, and to take a scale with them to weigh the ten grams of heroin they
were planning to obtain for $1,000.00.

22

51. At approximately 10:38 a.m., Target Telephone #2 made an outgoing telephone call to 423-486-3896, utilized by EBERHARDT. During the call, Jovani ROBINSON told EBERHARDT, "I may have somebody else meet you with the thousand dollars this week" and then stated, "Mike or Jeff." Jovani ROBINSON later stated, "I'm going to get one of them to call you right now." Based on my training and experience, and knowledge acquired during the course of this investigation, during this call Jovani ROBINSON was making arrangements with EBERHARDT to have Michael HICKS or Jeff LNU deliver $1,000.00 to EBERHARDT for EBERHARDT to obtain additional heroin from his source of supply.

52. At approximately 10:46 a.m., Target Telephone #2 received an incoming text message from 423-413-8146, used by Farrah WESTMORELAND, stating, "U don't think marl on will take the money do u?" Target Telephone #2 replied, "Hell no he talked to Joe and Mike is making the transaction/ not you AND it's no longer Marlons money" and "We are buying from him but don't owe him." Based on my training and experience, and knowledge acquired during the course of this investigation, in the above message WESTMORELAND was concerned that EBERHARDT would take their money without providing them with heroin and Heather ROBINSON replied that she and Jovani ROBINSON were not working for EBERHARDT but were customers of his.

53. At approximately 11:01 a.m., Target Telephone #2 sent an outgoing text message stating in part, "text when everything is done and you got the 10." Based on my training and experience, and knowledge acquired during the course of this investigation, in this text message Heather ROBINSON directed WESTMORELAND to advise her when she obtained the ten grams of heroin.

23

54. At approximately 12:12 p.m., Target Telephone #2 made an outgoing telephone call to WESTMORELAND at telephone number 423-413-8146. During the call, Heather ROBINSON stated, "Here's the plan. Just put the even one thousand in an envelope and pull up on Marlon yourself and just hand it to him. He's not even gonna give you the stuff. He's coming down to get it so he's gonna meet us here and give us the stuff." Heather ROBINSON later stated, "He's gonna meet us down in Atlanta and I'll just meet you when I get there and we'll swap baby for that." Based on my training and experience, and knowledge acquired during the course of this investigation, during this call, Heather ROBINSON directed WESTMORELAND to deliver one thousand dollars to EBERHARDT for him to obtain heroin. Heather ROBINSON then related that EBERHARDT was going to give the heroin to her in Atlanta and that she would deliver it to WESTMORELAND later.

55. At approximately 2:28 p.m., surveillance observed Farrah WESTMORELAND drive to EBERHARDT's residence located at 6612 Flagstone Drive, Ooltewah, Tennessee. EBERHARDT was then observed exiting the residence and meeting with WESTMORELAND. EBERHARDT and an unknown female were then observed leaving the residence in a vehicle. Surveillance was maintained on EBERHARDT. At approximately 4:33 p.m., a telephone conversation between Heather ROBINSON and EBERHARDT was intercepted during which EBERHARDT confirmed that he had received money from WESTMORELAND. EBERHARDT was subsequently followed to 210 Stonecreek Parkway, Covington, Georgia, the residence of EBERHARDT's known source of supply. After leaving the residence, EBERHARDT was followed to back to Chattanooga, Tennessee.

24

56. At approximately 4:41 p.m., EBERHARDT was observed traveling southbound on Interstate

75. At approximately 4:52 p.m., surveillance observed EBERHARDT's vehicle exit the

highway, make a sudden U-turn, and then enter the on-ramp to Interstate 75. Surveillance

later observed EBERHARDT drive to a motorcycle shop in Covington, Georgia. EBERHARDT

was later observed departing the area and was observed following a Hyundai Sports Utility

Vehicle bearing Illinois license plate H298204. This vehicle was previously associated with

Percy RICHARD and his residence located at 210 Stonecreek Parkway, Covington, Georgia.

Both vehicles were later observed driving to 210 Stonecreek Parkway, Covington, Georgia.

EBERHARDT was later observed leaving the area of Stonecreek Parkway and travel back to a

residence in the 3800 block of Fagan Street in Chattanooga, Tennessee.

## Intercepted Communication from Court Authorized Wiretap of Target Telephone #2 and Surveillance of Marlon Eberhardt on June 23, 2016

57. On June 23, 2016, at approximately 12:00 a.m., Target Telephone #2 sent an outgoing text

message to Farrah WESTMORELAND at telephone number 423-413-8146 stating, "when Joe

meets Bino to get that, Ima let u take him bc I want him to be scared to send the wrong

amount or some bullshit lol." Based on my training and experience, and knowledge

acquired during the course of this investigation, in this text message Heather ROBINSON

told WESTMORELAND that she would send WESTMORELAND with Jovani ROBINSON to get

heroin from Marlon EBERHARDT.

58. At approximately 1:45 p.m., Target Telephone #2 made an outgoing telephone call to

telephone number 423-486-3896. During the call, EBERHARDT asked Jovani ROBINSON

where he was at. Jovani ROBINSON replied, "I'm at the crib. Where I need to be."

25

EBERHARDT then stated, "Shit, I don't know just let me know and I'll get it." Based on my training and experience, and knowledge acquired during the course of this investigation, in this call EBERHARDT told Jovani ROBINSON to let him know when he was ready to meet and that he would get the heroin.

59. At approximately 1:47 p.m., Target Telephone #2 made an outgoing telephone call to WESTMORELAND. During the call, Heather ROBINSON stated, "Come get me so we can go get it." WESTMORELAND replied, "Okay." Heather ROBINSON later stated, "Hurry so Marlon don't move. So we go straight to him." Based on my training and experience, and knowledge acquired during the course of this investigation, during this call Heather ROBINSON asked WESTMORELAND to come pick her up so they could meet EBERHARDT to get heroin.

60. At approximately 2:17 p.m., Target Telephone #2 made an outgoing telephone call to WESTMORELAND. During the call, WESTMORELAND related that she was trying to get to Heather ROBINSON's residence. Heather ROBINSON then stated, "Okay I was making sure you were on your way because you know how fucking ridiculous Marlon is." Heather ROBINSON later stated, "Give you exactly ten and I ain't trying to let him get over on you." Based on my training and experience, and knowledge acquired during the course of this investigation, during this call Heather ROBINSON related that she would go with WESTMORELAND to meet EBERHARDT because Heather ROBINSON wanted to make sure EBERHARDT supplied them with the whole ten grams of heroin.

61. At approximately 2:25 p.m., surveillance established in the area of Farrah WESTMORELAND's residence observed WESTMORELAND depart her residence.

26

Surveillance was maintained on WESTMORELAND. At approximately 3:20 p.m.,

WESTMORELAND was observed arriving at Heather and Jovani ROBINSON's residence

located at 91 Lee Edwards Drive Lafayette, Georgia. At approximately 3:40 p.m.,

WESTMORELAND's vehicle was observed departing Heather and Jovani ROBINSON's

residence. Jovani ROBINSON was observed to be the driver and Heather ROBINSON and

WESTMORELAND were observed to be occupants of the vehicle. At approximately 4:15

p.m., the vehicle was observed parking in front of 3812 Fagan Street, Chattanooga,

Tennessee.

62. At approximately 4:17 p.m., Target Telephone #2 made an outgoing telephone call to 423-
486-3896, utilized by EBERHARDT. During the call, EBERHARDT directed Jovani ROBINSON
to go to the rear of his aunt's house.

63. At approximately 4:18 p.m., Target Telephone #2 made an outgoing telephone call to
telephone number 423-486-3896. During the call, EBERHARDT directed Jovani ROBINSON
to knock on the back door of his aunt's residence, and EBERHART instructed an unidentified
individual to give "it" to Jovani ROBINSON. Based on my training and experience, and
knowledge acquired during the course of this investigation, Your Affiant believes the "it"
referenced in the aforementioned telephone call to be the ten grams of heroin previously
requested by Heather and Jovani ROBINSON.

64. Thereafter, agents observed WESTMORELAND's vehicle depart from 3812 Fagan Street,
Chattanooga, Tennessee and surveillance was maintained on WESTMORELAND. At
approximately 4:34 p.m., surveillance observed WESTMORELAND's vehicle arrive at a
residence located on Woodside Street.

27

**Intercepted Communication from Court Authorized Wiretap of Target Telephone #3 and Surveillance of Marlon Eberhardt on July 15, 2016**

65. On July 15, 2016, at approximately 12:26 p.m., Target Telephone #3 received an incoming telephone call from Marlon EBERHARDT at telephone number 615-767-8914 stating, "I'm waiting on you man, I'm probably gonna have to dip." Jovani ROBINSON responded, "When she pull up on me I'm gone have her bring me wherever you at." During the same telephone call, Jovani ROBINSON later clarified by stating, "when Farrah pull up to get me, I'm gonna have her bring me to wherever you at." Based on my training and experience, and knowledge acquired during the course of this investigation, in this telephone conversation, Jovani ROBINSON told EBERHARDT that he was waiting on WESTMORELAND to transport him to EBERHARDT's location for the purpose of obtaining heroin from EBERHARDT.

66. At approximately 1:33 p.m., Target Telephone #3 sent an outgoing text message to Farrah WESTMORELAND at telephone number 423-413-8146 stating, "U sold all 5?" At approximately 1:34 p.m., Target Telephone #3 received an incoming text message from WESTMORELAND stating, "Not yet but I messaged everyone and they need me today." At approximately 1:41 p.m., Target Telephone #3 sent an outgoing text message stating, "Try to have all 5 gone so Joe can re up." Based on my training and experience, and knowledge acquired during the course of this investigation, in this conversation WESTMORELAND was instructed to sell the five grams of heroin that she was in possession of so that Jovani ROBINSON could obtain more heroin from EBERHARDT.

67. At approximately 2:40 p.m., law enforcement established surveillance at WESTMORELAND's residence located at 911 Intergra Hills, Ooltewah, Tennessee. For

28

approximately five hours, agents observed WESTMORELAND travel throughout the Ooltewah and Chattanooga, Tennessee area for the purpose of meeting with heroin customers. During this time period, WESTMORELAND sent and received multiple text messages to Target Telephone #3, providing updates as to her progress.

68. At approximately 9:03 p.m., a telephone call was intercepted between Target Telephone #3 and EBERHARDT. During this telephone call, Jovani ROBINSON informed EBERHARDT, "I got eleven though and I'll have the four for the night over with" and "I'm finna bring you 11 right now."

69. At approximately 9:57 p.m., agents observed WESTMORELAND's vehicle arrive at Heather ROBINSON's residence, located at 91 Lee Edwards Drive, in Lafayette, Georgia. Agents observed WESTMORELAND's vehicle leave ROBINSON's residence at approximately 10:22 p.m. and followed WESTMORELAND's vehicle until it arrived at 3812 Fagan Street, in Chattanooga, Tennessee, at approximately 11:25 p.m.

70. At approximately 11:26 p.m., Target Telephone #3 received an incoming text message from Jovani ROBINSON utilizing telephone number 423-999-1297 stating, "Great we headed back." Jovani ROBINSON later sent a text message to Target Telephone #3, stating, "Marlon was proud." At approximately 11:30 p.m., surveillance was terminated. Based on my training and experience, and knowledge acquired during the course of this investigation, in this text message Jovani ROBINSON stated that he and WESTMORELAND were headed back to 91 Lee Edwards Drive, Lafayette, Georgia after meeting with EBERHARDT, their heroin source of supply. Based on subsequently intercepted communications over Target Telephone #3 indicating that Heather ROBINSON, Jovani ROBINSON, and Farrah

29

WESTMORELAND continued to distribute heroin on July 16, 2016, agents believe that Jovani
ROBINSON and WESTMORELAND obtained heroin from EBERHARDT during their meeting on
July 15, 2016.

## Intercepted Communication from Court Authorized Wiretap of Target Telephone #3 and Surveillance of Marlon Eberhardt on July 22, 2016

71. On July 22, 2016 at approximately 4:06 p.m., during the course of monitoring court
authorized Title III intercepts of Target Telephone #3, agents intercepted an incoming
telephone call from telephone number 423-615-1212, known to be utilized by Caylin DIXON.
During the intercepted and recorded call, a conversation took place which included DIXON,
Heather ROBINSON, Jovani ROBINSON, and Marlon EBERHARDT. DIXON made the initial
call, which was answered by Heather ROBINSON. Heather ROBINSON asked DIXON "Where
is your baby daddy at?" DIXON responded "Right here". Jovani ROBINSON then got on the
telephone and spoke with DIXON. DIXON stated "He said what's up," referring to Marlon
EBERHARDT. Jovani ROBINSON subsequently told DIXON to tell "him" that he was "trying to
go to Nashville if you know what I mean." EBERHARDT subsequently got on the phone and
spoke with Jovani ROBINSON. Jovani ROBINSON asked EBERHARDT if he should go to
Nashville. After a short exchange, EBERHARDT instructed Jovani ROBINSON to call him
when he got there. EBERHARDT also stated "Man, I have the money." The call then
terminated. Based on my training and experience, and knowledge acquired during the
course of this investigation, during this call Jovani ROBINSON was calling EBERHARDT to
obtain heroin and EBERHARDT instructed Jovani ROBINSON to call him once Jovani
ROBSINSON arrived to EBERHARDT's location.

30

72. At approximately 4:34 p.m., agents intercepted an incoming telephone call to Target Telephone #3 from 423-413-8146, known to be utilized by Farrah WESTMORELAND. During the call, WESTMORELAND spoke with Heather ROBINSON. WESTMORELAND informed Heather ROBINSON that she was on her way to her house, referring to Heather ROBINSON's residence located at 91 Lee Edwards Drive, Lafayette, Georgia. WESTMORELAND then stated "I can probably uh, get some more money today if you know what I mean". Agents believe that WESTMORELAND was referring to collecting additional drug debts owed to her by heroin customers. Heather ROBINSON then told WESTMORELAND, "Yeah, I gonna let, um, Joe's, Joe's probably gonna leave out with you so that y'all can. He is just gonna ask if he can come a couple short." WESTMORELAND replied, "Yeah." Heather ROBINSON then stated, "And then pay him tomorrow." WESTMORELAND then said "Right, and I think, I mean I can get the rest tomorrow, myself. You know if nobody comes. You know what I mean."

73. Based on my training and experience, and knowledge acquired during the course of this investigation, the aforementioned call indicated that WESTMORELAND was attempting to further collect drug debts ultimately destined for Heather and Jovani ROBINSON. Heather ROBINSON indicated that Jovani ROBINSON would travel with Farrah WESTMORELAND to meet with EBERHARDT to arrange for the purchase of additional heroin even though they did not have the full amount of money that EBERHARDT would be expecting.

74. At approximately 6:55 p.m., detectives of the Hamilton County Sheriff's Office and agents and Task Force Officers from the DEA Chattanooga Resident Office established surveillance of EBERHARDT at his residence, located at 6612 Flagstone Drive in Ooltewah, Tennessee. At

31

approximately 7:04 p.m., agents observed EBERHARDT leave his residence in a silver Ford F-150, bearing Tennessee license plate R04-63R. The vehicle is registered to Devin EBERHARDT at 3812 Fagan Street, Chattanooga, Tennessee on a silver 2008 Ford F-150 truck. At approximately 7:24 p.m., agents observed the Ford truck arrive at 3812 Fagan Street.

75. At approximately 7:34 p.m., surveillance observed Farrah WESTMORELAND driving her Infiniti Q-70S Sports Utility Vehicle bearing Tennessee license plate R59-13N, on East 38th Street near Brannon Street, headed towards Fagan Street, Chattanooga, Tennessee. Surveillance observed that Jovani ROBINSON was in the front passenger seat. Surveillance then observed WESTMORELAND park her vehicle in front of 3812 Fagan Street, Chattanooga, Tennessee. Surveillance next observed Jovani ROBINSON, WESTMORELAND, and EBERHARDT meeting in front of the residence.

76. At approximately 7:50 p.m., agents intercepted an outgoing call from Heather ROBINSON, utilizing Target Telephone #3, to Jovani ROBINSON, who was utilizing telephone number 423-999-1297. During the conversation, Heather ROBINSON asked Jovani ROBINSON if he was on his way back, referring to their residence. Jovani ROBINSON replied, "No, I'm on Fagan Street." Heather ROBINSON then asked, "Is he there yet?" Jovani ROBINSON responded, "Yeah." Based on my training and experience, and knowledge acquired during the course of this investigation, when Heather ROBINSON asked if "he" was there, she was referring to EBERHARDT.

77. At approximately 7:56 p.m., surveillance units observed WESTMORELAND and Jovani ROBINSON depart 3812 Fagan Street, Chattanooga, Tennessee in the black Infiniti.

32

78. At approximately 8:16 p.m., agents intercepted an incoming text message to Target

Telephone #3 from Jovani ROBINSON, again utilizing 423-999-1297. The text message read,

"No Dope." Shortly thereafter, agents intercepted an outgoing text message from Target

Telephone #3 to Jovani ROBINSON which read, "Damn fr? He out or bc u r 2 short." Based

on my training and experience, and knowledge acquired during the course of this

investigation, Heather ROBINSON was asking Jovani ROBINSON if the reason for "No Dope"

was because EBERHARDT was out or because they did not have all of the money owed to

EBERHARDT.

79. At approximately 8:18 p.m., agents intercepted an incoming text message to Target

Telephone #3 from 423-999-1297. The text message read, "No more I got what he had doe

3.3." Based on my training and experience, and knowledge acquired during the course of

this investigation, Agents believe that Jovani ROBINSON was communicating to Heather

ROBINSON that he had purchased the last 3.3 grams of heroin possessed by EBERHARDT.

### Seizure of Heroin and Cocaine from Marlon Eberhardt and Farrah Westmoreland on July 26, 2016

80. On July 26, 2016, agents and officers from DEA conducted surveillance on Marlon

EBERHARDT subsequent to intercepting communications indicating that EBERHARDT and

WESTMORELAND were going to travel to Georgia to obtain heroin. At approximately 12:22

a.m., Marlon EBERHARDT was observed departing his residence located at 6612 Flagstone

Drive, Ooltewah, Tennessee with Farrah WESTMORELAND in WESTMORELAND's black

Infiniti Sports Utility Vehicle bearing Tennessee license plate R5913N. Constant surveillance

was maintained on EBERHARDT and WESTMORELAND. At this time, Tennessee law

33

enforcement officers contacted the Newton County Sheriff's Office and requested assistance with this investigation.

81. The vehicle was followed to Covington, Georgia and at approximately 5:10 a.m., Marlon EBERHARDT and WESTMORELAND were observed entering an Econo Lodge hotel in Conyers, Georgia. At approximately 7:45 a.m., EBERHARDT and WESTMORELAND were observed leaving the hotel and driving to Percy RICHARD's residence. At that time, EBERHARDT was observed entering the residence.

82. The black Infiniti was later observed to leave RICHARD's residence and constant surveillance was maintained on the vehicle. At approximately 9:45 a.m., Georgia State Police officers conducted a traffic stop on the vehicle occupied by EBERHARDT and WESTMORELAND in Rockdale County, Georgia. The vehicle was stopped for speeding and a window tint violation. Upon making contact with the occupants of the vehicle, the State Trooper observed fresh track marks consistent with narcotics use on WESTMORELAND's arms. WESTMORELAND also appeared to be nervous. WESTMORELAND was then asked if there was any heroin in the vehicle and she replied that there was and subsequently removed two packages from her groin area. The packages were later determined to contain approximately 128 gross grams of suspected heroin and 84 gross grams of suspected cocaine. The seized narcotics were subsequently sent to the DEA laboratory for testing and analysis and the results are pending.

83. EBERHARDT and WESTMORELAND were both arrested at the scene and have remained in custody in Rockdale County, Georgia since that time.

34

84. On July 26, 2016, a local search warrant was executed at RICHARD's residence, which resulted in the seizure of approximately $248,580.00 in United States Currency, eight ounces of heroin, six ounces of cocaine, drug paraphernalia, drug ledgers, and firearms.

### Interview of Farrah WESTMORELAND on August 9, 2016

85. On August 9, 2016, DEA interviewed Farrah WESTMORELAND in the presence of her attorney. During the interview, WESTMORELAND stated that she had been a customer of Heather and Jovani ROBINSON for approximately two years and had been purchasing approximately two grams of heroin from them on a daily basis. WESTMORELAND stated that she became a distributor for Heather and Jovani ROBINSON in approximately May 2016. At that time, Heather ROBINSON was residing at 91 Lee Edwards Drive, Lafayette, Georgia. Agents know that Jovani ROBINSON was in state custody at this time and was later released on June 1, 2016. WESTMORELAND stated that between May 2016 and the time of her arrest on July 26, 2016, she knew that Heather and Jovani ROBINSON would typically obtain approximately 10 grams of heroin at a time from their sources of supply.

86. WESTMORELAND identified EBERHARDT as Heather and Jovani ROBINSON's primary source of supply and Brandon MOORE as a secondary source of supply. WESTMORELAND stated that she would obtain heroin from EBERHARDT at Heather and Jovani ROBINSON's direction, at various locations in Chattanooga, Tennessee including 3812 Fagan Street, Chattanooga, Tennessee,[1] 4908 Marylin Lane, Chattanooga, Tennessee, a residence in Ft.

---

[1] Based on WESTMORELAND's description and directions to the residence, agents believe WESTMORELAND was referring to 3812 Fagan Street, Chattanooga, Tennessee.

35

Oglethorpe, Georgia, and a residence on Belle Vista in Chattanooga, Tennessee. WESTMORELAND identified the Ft. Oglethorpe, Georgia residence as Caylin DIXON's mother's house. DIXON is known to be EBERHARDT's girlfriend. WESTMORELAND identified EBERHARDT's primary residence as 6612 Flagstone Drive, Ooltewah, Tennessee. WESTMORELAND stated that EBERHARDT lived at the residence with his brother and Devyn HENSLEY. WESTMORELAND identified HENSLEY as a customer of Heather and Jovani ROBINSON that she delivered heroin to and stated that HENSLEY purchased $100 of heroin on a daily basis.

87. WESTMORELAND additionally stated that she had made four trips with EBERHARDT to RICHARD's residence in Covington, Georgia to obtain heroin and had made two trips with EBERHARDT to Knoxville, Tennessee to obtain heroin from Brandon MOORE. WESTMORELAND stated that prior to her and EBERHARDT's arrest on July 26, 2016, she met and picked up EBERHARDT from his residence at 6612 Flagstone Drive, Ooltewah, Tennessee. WESTMORELAND stated that they drove to another address in Chattanooga, Tennessee and then drove to an Econo Lodge in Conyers, Georgia, and later drove to RICHARD's residence located at 210 Stonecreek Parkway, Covington, Georgia to obtain heroin. WESTMORELAND stated that EBERHARDT went into the residence while she waited in the vehicle. WESTMORELAND stated that when EBERHARDT returned to the vehicle, EBERHARDT stated that he only received half, which WESTMORELAND understood to mean that EBERHARDT only received half of the normal amount or narcotics he usually received from RICHARD. EBERHARDT then handed a package to WESTMORELAND. WESTMORELAND stated that when they were being stopped by law enforcement, EBERHARDT handed her a

36

second package and she then concealed both packages on her person which was later seized by law enforcement.

**Interview of Michael HICKS on August 18, 2016**

88. On August 18, 2016, DEA interviewed Michael HICKS in the presence of his attorney. HICKS is currently incarcerated pending a federal supervised release revocation hearing in the Eastern District of Tennessee. A substantial portion of HICKS' information has been corroborated by independent investigation, including controlled purchases of narcotics, consensually recorded telephone calls, physical surveillance, the review of DEA documents as well as other federal, state, and local documents, interviews of other members of the above-stated drug trafficking organization, and the interception of court authorized communications. For these reasons, I consider HICKS to be reliable.

89. During the interview, HICKS stated that he was approached by Marlon EBERHARDT, Jovani ROBINSON and others to sell heroin in approximately February 2016. HICKS identified EBERHARDT as Jovani and Heather ROBINSON's heroin source of supply. HICKS stated that he agreed to sell heroin and subsequently received approximately seven grams of heroin from EBERHARDT. HICKS related that he later began accompanying Farrah WESTMORELAND to obtain heroin from EBERHARDT at Jovani and Heather ROBINSON's direction. HICKS stated that he did this on at least four occasions. HICKS stated on two of those occasions, he went with Farrah WESTMORELAND to 3812 Fagan Street, Chattanooga, Tennessee to obtain heroin from EBERHARDT. HICKS stated that on one of the trips to 3812 Fagan Street, EBERHARDT was upset about something and HICKS was unsure if

37

WESTMORELAND received heroin from EBERHARDT. On the other occasion, HICKS stated

that WESTMORELAND received approximately one ounce of heroin from EBERHARDT.

HICKS stated that "Cy" was typically present when HICKS and WESTMORELAND met

EBERHARDT at the Fagan Street address. HICKS stated that "Cy" lived in and distributed

cocaine from a structure behind the main residence of 3812 Fagan Street, Chattanooga,

Tennessee. HICKS stated that in the latter part of July 2016, HICKS observed "Cy" at 3812

Fagan Street with approximately ¼ kilogram of cocaine. Based on my training and

experience, possession of ¼ kilogram of cocaine is consistent with distribution and

inconsistent with personal use. HICKS also observed a large firearm being stored in the

outer structure of the residence. Law enforcement subsequently identified "Cy" as Devin

EBERHARDT.

## CONCLUSION

90. In summary, agents of the Drug Enforcement Administration have been investigating and

have obtained a substantial amount of information regarding the drug trafficking activities

of Marlon EBERHARDT and his associates. This investigation has revealed through verified

confidential source information, law enforcement surveillance, the seizure of narcotics, and

recorded telephone conversations that Marlon EBERHARDT has been for some time

involved in the trafficking of significant amounts of heroin. Your Affiant further submits

that there is probable cause to believe EBERHARDT utilized 3812 Fagan Street, Chattanooga,

Tennessee to facilitate his drug trafficking activity through the storage and sale of narcotics,

and the storage and maintenance of records, cellular telephones, packaging material, and

drug paraphernalia used in furtherance of his drug trafficking.

91. Your Affiant submits that probable cause exists to have the residence/premise/property, to

include any and all outbuildings and vehicles, located at 3812 Fagan Street, Chattanooga,

Tennessee, in the Eastern District of Tennessee, searched for the items contained in

Attachment B of this Affidavit.


Special Agent, William Wise
Drug Enforcement Administration


Sworn to and subscribed before me this
23rd day of August 2016.

Susan K. Lee
United States Magistrate Judge
Eastern District of Tennessee

## ATTACHMENT A

**Description of the Residence/Premises/Property located at 3812 Fagan Street, Chattanooga, Tennessee**

The residence is a single family home located at 3812 Fagan Street, Chattanooga, Tennessee. The residence is described as a one story structure with beige colored siding. The residence has a grey colored roof. The front door of the residence has a black framed screen door. The numbers "3812" are displayed above the front entrance to the porch. The mailbox fronting the residence displays the numbers "3812." The residence is surrounded by a chain link fence.



## ATTACHMENT B

### Items to Be Searched for at the Residence/Premises/Property located at 3812 Fagan Street, Chattanooga, Tennessee

(1)     Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2)     Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3)     Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4)     United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5)     Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular cocaine and marijuana, including, but not limited to scales, baggies, packing material;

(6)     Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7)     The visual image, by way of photography, of all furnishings and equipment in, on, under,

41

attached, or appurtenant to said premises;

(8) Papers, tickets, notes, schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9) Firearms;

(10) Cellular telephones, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone; and Pagers.

(11) Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, which include distribution of and possession with intent to distribute controlled substances, using a communication facility in facilitating the commission of a drug offense, and conspiracy to distribute/possess with intent to distribute controlled substances; and 18 U.S.C. § 1956, which includes money laundering.